915 A.2d 1010

**Charnard Demon JONES**

v.

**STATE of Maryland.**

**No. 166, Sept. Term, 2006.**

Court of Special Appeals of Maryland.

Jan. 30, 2007.

Gary E. Bair (Fred Warren Bennett, on brief), Greenbelt, for appellant.

Shannon E. Avery (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellee.

Panel MURPHY, C.J., EYLER, DEBORAH S. and MEREDITH, JJ.

EYLER, DEBORAH S., J.

A jury in the Circuit Court for Baltimore County convicted Charnard Demon Jones, the appellant, of first-degree sexual offense, second-degree sexual offense, sodomy, and second-degree assault. The court sentenced him to 30 years' impris-

onment on the first-degree sexual offense conviction and merged the other convictions for sentencing.

Before this Court, the appellant poses two questions for review, which we have rephrased slightly:

I.  Did the trial court err in rejecting his territorial jurisdiction argument as a matter of law, instead of submitting that issue to the jury for decision?

II.  Did the trial court err in ruling that the evidence was legally sufficient to establish a proper chain of custody of the DNA evidence taken during the SAFE examination of the victim?

For the following reasons, we shall affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS

The events central to this case occurred in the early morning hours of December 4, 1998. Sometime around midnight on December 3–4, the victim went to a bar called Nick's Place, which is located in the Savoy Plaza in the 8500 block of Liberty Road. That address is in the Randallstown area of Baltimore County. The victim planned to meet her sister there. She had been drinking heavily for much of the day. Before going to Nick's, the victim and a friend of a neighbor had been drinking at a bar in Baltimore City. The neighbor's friend gave the victim a ride to Nick's bar and dropped her off there.

The victim's sister never showed up at Nick's. The victim drank two mixed drinks and then, around 1:30 a.m., left the bar and sat outside on the street curb. For a while, she talked to a man she knew as Claudis. She started to feel "woozy" and decided to use the nearby pay telephone to make a call. She tripped and fell on her way to the telephone booth and hit the back of her head on the ground. She sat back down on the curb and someone "came up next to [her] and was talking to [her]," but she could not remember who the person was or "picture the face."

The victim remembered being put in a car and "being in a car." The car was moving and it was dark. She was in the back seat with another person and was saying, "Let me out this car." The person in the back seat then "just started beating [her] in [her] face." She felt sick and dizzy and wanted to get out of the car because her "head was spinning." She described what she remembered happening while she was being beaten:

> I don't remember too much. I remember being beaten in the face, and then when the car stopped it's, like—I don't know, the person must have got out of the car. I know I was still wanting to fight and trying to get away, and I just felt somebody, like, turn me over on my stomach and pull my pants down, and I felt a penis penetrate into my rectum.
>
>       \*      \*      \*
>
> I was, like, passed out again after that. It [sic] kept beating me in the back of my head. I was so scared because I know it was a rape thing going on, and I was really just blanking out.

After testifying that she was positive that she was sodomized, and not vaginally raped, and describing the clothing she had been wearing that night, the victim continued in her recitation of events:

> The next thing I remember is somebody turning me over, but I still couldn't see nothing because I was so drunk. I started throwing up. I was leaning back throwing up this way, and I heard the person, I guess, whose car it was, "Get this bitch out my car, because she hurling." Then the person in the back seat who did whatever they had to do, dragged me out of the car, and that was it.

Sometime during the beating and being dragged out of the car the victim's ear "was sliced in half" and her chin and one of her eye sockets were injured.

The victim testified that she believes she passed out or fell asleep where she was left, which turned out to be in Leakin Park, in Baltimore City. At some point, she woke up, thinking she was in bed having a bad dream, but found herself outside

lying on the ground in the dark. Eventually, she got up and started walking until she saw a light, which was the streetlight at the intersection of Windsor Mill Road and North Forest Park Avenue. She followed the light to a gas station on that corner.

The only clothes the victim was wearing at that time were a shirt and socks. The rest of her clothing (jeans, boots, and a leather jacket) and her purse and its contents were gone. When she reached the gas station, she "[j]ust stood there in shock[.]" She tried to tell the people there her name. She remembered that her sister lived nearby, and gave the gas station workers a piece of paper with her sister's telephone number on it. Her sister came to the gas station to get her. The next thing she remembers is waking up at Mercy Medical Center.

The initial call from the gas station was made to the Baltimore City Police Department, at 5:50 a.m. Soon thereafter, when the Baltimore City police realized that the victim had been accosted outside of Nick's Place in Baltimore County, the case was transferred to the Baltimore County Police Department.

That same day, at 1:00 p.m., the victim was examined by Leslie Crimy, R.N., a SAFE (Sexual Assault Forensic Examination) nurse at Mercy Medical Center. During the examination, anal swabs were obtained. We shall discuss that examination and the physical evidence when we address the appellant's second question presented.

Detective Debra Milholen–Tribull of the Baltimore County Police Department was in charge of the criminal investigation of this case. The investigation was closed after two months because it had failed to produce a viable suspect. For six years, the case remained dormant. Then, in 2004, DNA evidence from the swabs taken from the victim was sent to the Bode Technology Group, an independent laboratory, for analysis.[1] When the results of the analysis were entered into the

---

1. In the trial transcripts, Bode is misspelled "Bodie." We have used the spelling that appears on its report.

State's DNA database they matched the appellant's DNA. The appellant was indicted on January 18, 2005.

Expert testimony introduced at trial revealed that the likelihood that the source of the DNA found on the anal swab obtained from the victim was someone other than the appellant was between one in 71 quadrillion and one in 260 quadrillion.

We shall include additional facts as relevant to our discussion of the issues.

## DISCUSSION

### I.

### *Territorial Jurisdiction*

On cross-examination, the victim testified that for at least part of the time she was in the back seat of the car, where she was sodomized, the car was being driven, at times at a high speed. She knew that she was put in the car in front of Nick's Place, on Liberty Road, in Baltimore County, and that she was dragged out of the car and deposited in Leakin Park, in Baltimore City. She testified that, between those two times, she did not "know where I went, how we got there on the road, how we got in the park or none of that. . . ."

The following exchange between defense counsel and the victim then ensued:

Q: The driver could have taken you on the Beltway?

A: I don't know. I don't remember.

Q. He could have taken you on the BW Parkway headed toward D.C., correct?

A. I don't know. I don't know what you're saying. I mean, I ended up where I ended up at.

Q. But you don't know, so the rape could have taken place in D.C. in a car, correct?

A. It could have, but I know it didn't.

Q. How do you know?

A. Because I know.

Q. How do you know?

A. Because I know it didn't. Why wouldn't they leave me in D.C. then?

Q. Well, we can't speak for people.

A. Well, you know what? I don't know.

Q. So you don't know whether it happened in D.C., Virginia or Maryland?

A. It happened.

Q. We are not disputing it happened, but you don't know where it happened, correct?

A. I don't know where it happened, but it happened in the car.

Q. How long were you in the car after this alleged rape occurred?

A. Oh, they just did what they had to do and that was it. They wanted me up out of there then.

Q. Do you remember how long that was?

A. I can't remember. I know after it was over with they did what they had to do. They flipped me over and dragged me and just dropped me off, just like that.

In addition, Detective Milholen–Tribull testified on cross-examination that, when she interviewed the victim, she did not know where the sexual assault had occurred, other than that it had happened in the back seat of the car she had been put in.

At the close of the State's case, the defense moved for judgment of acquittal on several counts, some of which were granted. The defense rested and then moved to dismiss for lack of territorial jurisdiction.

Defense counsel argued that the sum total of the evidence on territorial jurisdiction was that the victim did not know where the sexual assault had taken place and only knew that she was put in a car in Baltimore County, was driven around, at times at high speed, and wound up in Leakin Park, in Baltimore City, some five hours later. According to defense

counsel, "[b]ased on that . . . the government has not proven beyond a reasonable doubt that this incident took place in the State of Maryland, therefore, this Court lacks jurisdiction, and we ask that it be dismissed."

The prosecutor, focusing not on State territorial jurisdiction but on venue (whether there was sufficient evidence that the sexual assault took place in Baltimore County, as opposed to in Baltimore City), responded that the victim did not know where the car went when she was inside of it because she was in the back seat with her head down. However, she argued, "there's certainly sufficient evidence to infer from—the Court can infer and the jury could find that this assault took place in Baltimore County." The prosecutor went on to point out that Leakin Park is near the western City/County line and is a "common dumping ground," so the victim's having been left there by her assailants did not mean that that was the location of the sexual assault.

The court denied the motion to dismiss, stating,

I have listened carefully to the testimony of [the victim] . . . as it relates to the issue of jurisdiction, and I do feel that both this Court and the jury can reasonably infer that the assault and the sex offense did occur in Baltimore County. Based on the testimony and the evidence in this case, I feel that this Court does have jurisdiction, so your motion is denied.

The court then entertained argument of counsel on instructions. Defense counsel did not request an instruction on territorial jurisdiction, and no mention of any such instruction was made. The court did not give an instruction on territorial jurisdiction. After the court instructed the jury, neither counsel lodged an objection. Indeed, they were asked by the trial judge whether they had any objections and each responded in the negative.

In closing argument, the only reference to the physical location of the crime was defense counsel's assertion that the victim's lack of knowledge about where the crime took place, during the several hour period in which she was in the back

seat of the car, was one of many instances of doubt that, taken together, amounted to reasonable doubt. Defense counsel did not ask the jurors to make a factual finding as to whether the sexual assault had occurred in the State of Maryland.

Relying upon *West v. State*, 369 Md. 150, 162, 797 A.2d 1278 (2002), and *Painter v. State*, 157 Md.App. 1, 9–10, 848 A.2d 692 (2004), the appellant argues that the evidence at trial generated a genuine dispute of fact on the issue of territorial jurisdiction, *i.e.*, whether the sexual assault was committed in the State of Maryland; and that, once generated, the disputed issue was for the jury, as fact-finder, to decide, beyond a reasonable doubt. He maintains that the trial judge should have submitted the issue of territorial jurisdiction to the jury for decision instead of ruling on the issue as a matter of law, and that, by so ruling, the judge "foreclosed defense counsel from requesting a jury instruction on the issue and from arguing to the jury that there was reasonable doubt that the offense occurred within the State of Maryland."

The State responds that the appellant did not preserve this issue for appellate review because he did not request an instruction about territorial jurisdiction or object to the absence of such an instruction. The State further argues that, in any event, the trial court properly denied the motion to dismiss because there was not a genuine dispute over territorial jurisdiction and, if there was, it was an issue of fact for the jury to decide only upon a request by the defense, which was not made.

"Territorial jurisdiction describes the concept that only when an offense is committed within the boundaries of the court's jurisdictional geographic territory, which generally is within the boundaries of the respective states, may the case be tried in that state." *State v. Butler*, 353 Md. 67, 72, 724 A.2d 657 (1999). In Maryland, territorial jurisdiction is not an element of the offense for which the defendant is on trial, so as to require that it be proven in every case. *Id.* at 79 n. 5, 724 A.2d 657. However, "when evidence exists that the crime may have been committed outside Maryland's territorial juris-

diction and a defendant disputes the territorial jurisdiction of the Maryland courts to try him or her, the issue of where the crime was committed is fact-dependent and thus for the trier of fact." *Id.* at 79, 724 A.2d 657. Territorial jurisdiction may be proven by circumstantial evidence. *McDonald v. State,* 61 Md.App. 461, 468, 487 A.2d 306 (1985).

For territorial jurisdiction to be an issue for the jury to decide, the evidence must raise a genuine dispute about where the crime was committed. "A bald conclusory assertion that the offense was not committed within Maryland's territorial jurisdiction ... is not, by itself, sufficient to create a dispute as to territorial jurisdiction—there must be some supportive evidence." *Butler, supra,* 353 Md. at 79, 724 A.2d 657. It is not enough for the defendant to "make a bare allegation that the crime might have occurred outside of Maryland in order to sufficiently generate the issue of lack of jurisdiction." *McDonald, supra,* 61 Md.App. at 469, 487 A.2d 306. When the evidence generates a genuine issue of territorial jurisdiction, the prosecution must prove, beyond a reasonable doubt, that the crime was committed within the geographic limits of the State of Maryland. *Butler, supra,* 353 Md. at 83, 724 A.2d 657.

In *Butler,* the defendant was convicted of murdering his girlfriend, her brother, and her young son. The bodies were found in an abandoned car in the District of Columbia. Two of the victims had been shot and one had been asphyxiated. There was evidence that a gun had been fired inside the passenger compartment of the vehicle. The police were called when bystanders saw that the vehicle was on fire. The fire later was determined to have been deliberately set. The defendant was charged in Prince George's County, where he and his girlfriend and her son had been living.

The prosecution introduced substantial evidence to support a finding that the murders happened in the State of Maryland, not in the District of Columbia where the bodies were found. The defense disputed that the crimes had occurred in Maryland, moving for judgment of acquittal on that ground and,

when its motion was denied, requesting a jury instruction on the issue of territorial jurisdiction. The court denied the instruction, ruling that as a matter of law the crimes had been committed in Maryland. The Court of Appeals reversed and remanded for a new trial, holding that the defense had generated a genuine dispute as to territorial jurisdiction, which should have been submitted to the jury to decide.

Three years after the Court of Appeals decided *Butler*, it ruled in *West v. State*, 369 Md. 150, 797 A.2d 1278 (2002), that the State lacked territorial jurisdiction to prosecute a defendant for sexual offenses for which he had been tried and convicted. The evidence was uncontradicted that the defendant and an accomplice had abducted the victim in Prince George's County and driven her into the District of Columbia, where they committed sexual offenses against her. Afterward, they drove away from the scene, and directed the victim to get out of the car, which she did. They still were in the District at that time.

At trial, the defendant moved to dismiss the sexual offense charges on the ground that the State did not have territorial jurisdiction to prosecute him, as the crimes took place in the District of Columbia. The trial court denied the motion and instructed the jury on territorial jurisdiction. The jury found that Maryland had territorial jurisdiction and found the defendant guilty of the sexual offenses.

The Court of Appeals reversed the convictions. It held that the uncontroverted evidence about the commission of the sexual offenses showed at the very least that all of the primary elements of those crimes had been committed in the District. Therefore, the evidence was legally insufficient to support a finding of territorial jurisdiction in Maryland. The issue should have been decided, as a matter of law, in favor of the defendant.

Finally, and most recently, in *Painter, supra,* this Court approved the circuit court's jury instruction on territorial jurisdiction in a prosecution for theft. It was alleged that the defendant had stolen cattle from two farms in Frederick

County, taken them to Pennsylvania, and sold them there. The court instructed the jury that to convict, it had to find, beyond a reasonable doubt, that all of the elements of the crime of theft had been committed in the State of Maryland. By implication, this Court (and the circuit court) recognized that the evidence had generated a genuine dispute of fact on the issue of territorial jurisdiction.

In the case at bar, the appellant did not preserve the issue of territorial jurisdiction for review; and in any event, the evidence did not generate a genuine dispute on that issue.

We disagree with the appellant that the trial court's ruling on his motion to dismiss precluded him from requesting a jury instruction on the issue of territorial jurisdiction. In moving to dismiss the charges, the appellant was asking the court to rule, as a matter of law, that the State did not have jurisdiction over him. In denying the motion, the trial judge commented that the facts were sufficient to allow a reasonable juror, or the court, to infer that the sexual assault occurred in Maryland.

■ Nothing about that ruling barred the appellant from seeking a jury instruction about territorial jurisdiction. Indeed, if anything, the court's ruling seemed to be based upon a finding that territorial jurisdiction was a factual, not a legal, issue. In any event, by not asking the court to submit the issue of territorial jurisdiction to the jury to decide, by means of an instruction, the appellant failed to preserve this issue for review. Md. Rule 4–325(e).

■ Even if the issue had been preserved, we would not find merit in it. Viewed in a light most favorable to the appellant, the evidence at trial showed that the victim was put inside a car in the Randallstown area of Baltimore County, northwest of the City and just outside the Baltimore Beltway; was driven around, at times at high speed; was sexually assaulted when the car was not moving; and then was dumped in Leakin Park, in the City, near the western City/County line. The total period of time that elapsed from when the victim was put in the car, at about 1:30 a.m., to when she made her

way to a gas station and the police were called, at 5:50 a.m., was 4 hours and 20 minutes. For some part of that time, the victim was by herself, in Leakin Park.

The appellant's argument at trial, and here, is that because it is physically possible to drive a car from Nick's Place, in Randallstown, into the District of Columbia (or Pennsylvania), and back to Leakin Park within a 4 hour and 20 minute period of time, and because the victim did not see where she was being driven but knew that she was on high speed roads for some period of time, a genuine dispute was generated over whether the sexual assault took place in Maryland. We disagree.

Evidence of a mere possibility that a crime did not take place in Maryland is not sufficient to create a genuine factual dispute about territorial jurisdiction. In *Butler*, there was evidence that the defendant and the victims had been in the District of Columbia: the defendant's car was found there, with the victims' bodies inside. The dispute was over whether the killings already had been carried out before the defendant drove the victims into the District, or whether he drove them into the District and killed them there. The Court held that the evidence generated a genuine dispute about territorial jurisdiction that should have been submitted to the jury for decision.

Likewise, in *Painter, supra*, there was evidence that the defendant had traveled to and from Frederick and areas of Pennsylvania, where he had been seen and had transacted business, including the sale of cattle he was alleged to have stolen. That evidence was sufficient to create a genuine factual dispute about whether all of the primary elements of the crime of theft had been committed in Maryland, and hence to warrant a jury instruction on territorial jurisdiction.

In *West, supra*, the evidence at trial established, without contradiction, that the victim had been abducted in Maryland but had been driven into the District of Columbia by the defendant and his cohort and had been sexually assaulted there. Because the evidence was conclusive that the sexual

assault was committed in the District, not in Maryland, the Court of Appeals held as a matter of law that the circuit court did not have territorial jurisdiction to prosecute the defendant for that crime.

In this case, by contrast, there is no evidence whatsoever that the car in which the victim was sexually assaulted traveled into the District of Columbia or Pennsylvania (as defense counsel argued at trial) during the early morning hours of December 4, 1998. To be sure, in the several hour time frame involved, the person at the wheel of the car could have driven it into the District or Pennsylvania, and back to Leakin Park; or for that matter he could have driven into Virginia, West Virginia, Delaware, or southern New Jersey, and back to Leakin Park in that time frame. Maryland is a small state that borders or is near many other states, some also small, and the District of Columbia; hence, it is possible in a four to five hour span of time to drive from the Baltimore area into one of the surrounding states or the District and back, with time to spare. The mere fact that it was physically possible for the appellant and his accomplice to have driven the victim out of state and then back to Maryland in that time period, standing alone, is speculation, not evidence.

The case that most closely resembles the one at bar is *McDonald v. State, supra.* There, the defendant was convicted of attempted second-degree murder and other offenses in connection with the severe beating of his live-in girlfriend. The couple resided in a house in Germantown with the victim's two children. The defendant and the victim had gone to dinner at a restaurant in Gaithersburg. At 9:30 p.m., the victim called her daughters at home and told them she and the defendant would be there shortly. The two did not arrive home until 2:30 a.m., however, and it was obvious from the victim's condition at that time that she had sustained serious injuries. Although she lived, she never recovered fully enough to be able to communicate what had happened that night.

Charges were brought against the defendant in the Circuit Court for Montgomery County. On appeal following conviction, the defendant argued that the circuit court had been without jurisdiction to hear the case because the State had not proven that the crime had been committed in Maryland. This Court rejected the argument, explaining:

> In the instant case, the evidence supports an inference that [the victim's] beating by the [defendant] took place in Montgomery County, Maryland. There was evidence adduced at trial to show that the [defendant] and [the victim] were seen leaving the [restaurant] in Gaithersburg, Maryland at approximately 9:30 p.m. Further [the victim's daughter] testified that she observed the [defendant] carry [the victim] into their Germantown, Maryland home at 2:00 a.m. the following morning. *The [defendant], on the other hand cannot point to even a scintilla of evidence which would indicate that the crime was committed outside of Maryland. Rather he speculates that the location of the [restaurant] is such that in the period of time during which the whereabouts of the [defendant] and [the victim] could not be shown, they could have traveled into several other states as well as the District of Columbia.*
>
> It is incumbent upon the [defendant] to do more than make a bare allegation that the crime might have occurred outside Maryland in order to sufficiently generate the issue of lack of jurisdiction.

*McDonald, supra,* 61 Md.App. at 468–69, 487 A.2d 306 (emphasis added).

Likewise, in this case the evidence adduced by the appellant was legally insufficient to generate the issue of territorial jurisdiction. Evidence that the driver of the car involved in this crime **could have** traveled from Randallstown outside of Maryland before the crime was committed and **could have** traveled back to Leakin Park after the crime was committed is not evidence that he did so. Moreover, the victim's testimony that at times the car was being driven at high speed did not elevate the issue of territorial jurisdiction from mere conjecture to a genuine dispute of fact. The Baltimore Beltway, a

high-speed road that divides the Randallstown area of Baltimore County, where Nick's Place is located, from inner Baltimore County and the City, including the Leakin Park area, does not cross any state line. It would be nothing short of guess work to surmise from evidence that the car at times was traveling at high speed that it had been driven out of state. Without evidence amounting to more than conjecture that the crime was committed outside of Maryland, the issue of territorial jurisdiction was not generated for decision by the jury and, if the court had been asked to grant an instruction on that issue, and had refused, it would not have erred.

## II.

### *Chain of Custody of DNA Evidence*

■ The evidence at trial on the issue of chain of custody of the DNA material obtained from the victim was as follows.

Nurse Crimy testified that at 1:00 p.m. on December 4, 1998, she examined the victim at Mercy Medical Center and collected an anal swab. She observed the sample and did not see any sperm on the swab at that time. She did not perform any tests for the presence of sperm. She allowed the swab to dry and then placed it in a sealed sexual assault kit ("kit"), which was placed in a "double locked" SAFE evidence locker. Nurse Crimy could not recall the name of the person who retrieved the kit for Baltimore County. Upon being shown the kit at trial, she testified that the package appeared to be in the same condition as when she collected it, for the most part.

Officer Robert Huncher is a forensic technician with the Baltimore County Police Department. He testified that at 6:30 p.m. on December 4, 1998, he retrieved the kit from the locked SAFE evidence locker at Mercy Medical Center and delivered it to the secure lab facility at the Baltimore County Police Department. He did not know precisely what time he took the kit to police headquarters other than it "definitely" was the same day. He signed a chain of custody sheet for the kit but did not write the date and time on it. He testified that, from the fact that his signature is on the chain of custody

sheet, he knows that he placed the kit in the refrigerator as he was supposed to do.

Linda Watson is a forensic microbiologist and supervisor of the biology unit of the Baltimore County Police Department. She testified that on February 26, 1999, she received the kit and placed it under security in her refrigeration unit in the biology unit. The refrigeration unit is locked every night and unlocked every morning. The biology unit itself is alarmed at night. She did not know whether anyone else had examined the kit before then. There were at least three other people in her department that could have had access to the kit while it was there.

On March 1, 1999, Ms. Watson performed an analysis of the evidence in the kit. She performed a test on the swab that revealed the presence of semen. She prepared a report of her findings and returned the kit to the evidence management unit. Her name appears on the chain of custody form on that date.

According to Ms. Watson, a request for analysis of the evidence was submitted on July 15, 2001. There was no signature on the request form. In July 2003, the kit was retrieved in anticipation of its being sent to an outside laboratory for analysis.

Laura Pawlowski, an evidence screener for the biology unit, testified that the kit was kept sealed and frozen in the lab from the time it was received until she packaged it and sent it by Federal Express to the Bode Technology Group for DNA testing on May 26, 2004.

Ashley Fulmer, an employee of Bode, testified that she received the kit on May 27, 2004. From July 13th to July 19th, 2004, Fulmer ran DNA tests using the samples from the anal swab. From these tests, she determined the genetic profile of the semen on the anal swab. She prepared a report of her findings and submitted it to the Baltimore County Police Department.

At the close of the State's case, the defense moved for judgment of acquittal on the ground that the DNA evidence was the only evidence linking the appellant to the crimes and that that evidence was unreliable, as a matter of law, because the State did not introduce evidence sufficient to establish chain of custody. The court denied the motion.

The proponent of a particular tangible item of evidence must establish its "chain of custody," *i.e.*, must "account for its handling from the time it was seized until it is offered into evidence." *Lester v. State*, 82 Md.App. 391, 394, 571 A.2d 897 (1990). "The circumstances surrounding [the] safekeeping [of the item of evidence during that time] need only be proven as a reasonable probability ... and in most instances is established ... by responsible parties who can negate a possibility of 'tampering'... and thus preclude a likelihood that the thing's condition was changed." *Wagner v. State*, 160 Md.App. 531, 552, 864 A.2d 1037 (2005) (citing *Best v. State*, 79 Md.App. 241, 250, 556 A.2d 701, *cert denied*, 317 Md. 70, 562 A.2d 718 (1989)).

The appellant maintains that the State's chain of custody evidence did not establish by a standard of reasonable probability that the anal swab evidence was in substantially the same condition when it was tested as it was when the crime occurred; and did not negate a possibility that the evidence had been tampered with between the time it was collected and the time of testing and of trial.

In particular, the appellant points out that 1) the DNA evidence was not timely collected and the examination was not timely completed; 2) the DNA evidence was not properly logged by Robert Huncher when he picked it up from Mercy Medical Center; 3) it is unknown whether the DNA evidence was properly refrigerated; 4) a signature was missing from the request for analysis submitted on July 15, 2001; and 5) no semen was seen on the anal swab on December 4, 1998, but semen was found when the evidence was analyzed on March 1, 1999. Also, at oral argument before this Court, counsel for the appellant pointed out that there was testimony from Ms.

Pawlowski that the chain of custody form states that a man named Rob Burkendine received the kit on December 14, 1998, and returned it the next day; and that that too shows uncertainty about the integrity of the DNA evidence in this case.

We agree with the State that the evidence adduced at trial was sufficient to show by a standard of reasonable probability that the anal swab with the critical DNA evidence linking the appellant to the crime had not been tampered with and was substantially the same as when it was collected. There were chain of custody documents and there was testimony by several of the people in the chain of custody to explain how the evidence was moved and where it was kept during the years between the crime and the DNA testing. To be sure, there were details on the chain of custody sheet that some witnesses did not know, but that reasonably could be interpreted as minor pieces of information, not indicative of tampering or contamination.[2]

The gaps in knowledge that some of the witnesses had, which may well have been filled if every witness having any connection with the chain of custody had been called, permitted an argument by defense counsel, in closing, that the jury should not credit the DNA evidence. Those gaps were not such as to compel a ruling, as a matter of law, that a proper chain of custody of the DNA evidence had not been shown. The State's chain of custody evidence met the threshold showing of a reasonable probability that the DNA evidence had not changed in condition, so as to be unreliable, from the time of collection to the time of testing and trial. *See Wagner v. State, supra,* 160 Md.App. at 552, 864 A.2d 1037.

**JUDGMENTS AFFIRMED. COSTS TO BE PAID BY THE APPELLANT.**

---

**2.** The timing of the DNA collection had nothing to do with chain of custody. Nor did the evidence that sperm was not seen in the anal swab on December 4, 1998, but was seen on March 1, 1999, although the State countered with evidence that the first test was less specific than the second.