*Christine Pifer, et al. v. Irwin Industrial Tool Co.*, Case No. 1849, September Term 2019, Opinion by Nazarian, J.

**EVIDENCE – AUTHENTICITY – MD. RULE 5-901 – LEGAL STANDARD**

Maryland Rule 5-901 provides that "the requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." To meet that standard, the proponent must demonstrate a reasonable probability that the evidence is what he claims it to be.

**EVIDENCE – AUTHENTICITY – MD. RULE 5-901 – CHAIN OF CUSTODY**

The estate of a deceased carpet installer who alleges to have used chalk manufactured by Irwin Industrial Tool Company ("Irwin") in his work demonstrated a reasonable probability that chalk exemplars obtained on eBay are authentic for the purposes of admissibility, *i.e.*, the estate established that there is a reasonable probability that the exemplars are representative of the chalk alleged to have exposed the decedent to asbestos that caused his mesothelioma. It was undisputed that (1) the exemplar containers are Irwin's, (2) noncommercial amphibole asbestos is regulated and not easily found, (3) the exemplars came from nine different sellers in seven different states who, to tamper, would have had to lace the chalk exemplars with asbestos intentionally, (4) a majority of the exemplars tested positive for asbestos, (5) each exemplar contained chalk matching the color designated on the label, and (6) an overwhelming majority of the samples arrived sealed and with no evidence of tampering. The gap in the chain of custody resulting from sourcing the exemplars from eBay did not render them categorically inadmissible; instead, the gap is part of the factual picture the jury should consider in determining whether the evidence is reliable and whether the plaintiff has met its burdens of proof on the merits.

Circuit Court for Baltimore City
Case No. 24X18000217 & 24X18000208

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1849

September Term, 2019

_____

CHRISTINE PIFER, ET AL.

v.

IRWIN INDUSTRIAL TOOL CO.

_____

Nazarian,
Shaw Geter,
Wells,

JJ.

_____

Opinion by Nazarian, J.

_____

Filed:  September 1, 2021


Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.

Suzanne C. Johnson, Clerk

* Friedman, J., and Gould, J., did not participate in the Court's decision to designate this opinion for publication pursuant to Md. Rule 8-605.1.

The ostensible main issue in this appeal is whether the trial court erred in granting a motion *in limine* to exclude evidence on authenticity grounds. But underlying that seemingly preliminary meta-question—is there evidence sufficient to support a finding that a piece of evidence a plaintiff would like to offer at trial is what its proponent claims?, *see* Md. Rule 5-901(a)—lies a tricky dynamic about the quantum of proof required for a piece of evidence to get over the admissibility threshold and before a jury. Trial judges often are described, including in the briefs of this case, as gatekeepers. But is the court guarding a threshold readily surmounted by a step or a hop? Or a gate that is closed unless opened or unlocked? In the same way that trial judges now evaluate the reliability of proffered expert testimony as a prerequisite to admission, *see Rochkind v. Stevenson*, 471 Md. 1 (2020), motions asking courts to invoke their evidentiary gatekeeper role easily can mission-creep toward a pre-trial judicial evaluation of evidence on the merits. That tension lies at the heart of this case.

The Estate of Richard Pifer ("the Estate") brought a wrongful death asbestos product liability claim against Irwin Industrial Tool Company ("Irwin"), alleging that chalk it sold from 1960 to 1982 contained asbestos that caused Richard Pifer to contract and die of mesothelioma. Irwin filed a motion *in limine* to exclude from evidence vintage chalk samples, obtained by the Estate on eBay, that tested positive for asbestos. At the same time, Irwin also filed a motion for summary judgment. The trial court held a hearing and granted Irwin's motion *in limine* to exclude the eBay chalk exemplars, but not the bottle found in Mr. Pifer's garage, and denied Irwin's motion for summary judgment. Two days after the motions hearing, though, the court granted Irwin's motion for summary judgment.

The Estate appeals the trial court's rulings on both motions. We hold that the court required more certainty about the contents and provenance of the chalk samples than the law requires, and we reverse the trial court's order granting the motion *in limine*. From there, we are not persuaded that the trial court considered and granted summary judgment independently on alternative grounds, so we remand for further proceedings.

## I.     BACKGROUND

Irwin Auger Bit Company was founded in 1885 and claimed to be "the largest producer of wood-boring tools." In 1960, Irwin bought Strait-Line Products Company. After merging, Irwin redesigned all of the Strait-Line products and developed new packaging for them. All of Irwin's Strait-Line products were made and packaged in Wilmington, Ohio. Among the products was a chalk, Strait-Line Marking Chalk, that was used, as its name suggests, for marking.

Mr. Pifer was an employee of Clyde W. Dent Carpet Installation ("Dent") in College Park, Maryland from 1960 to 2002. Initially, Mr. Pifer worked as a mechanic, installing carpet, from 1960 until the mid-1970s. He transitioned to working in the Dent warehouse, where he cut carpet to size.

As a mechanic, Mr. Pifer used Strait-Line marking chalk every day to mark on carpet where it needed to be cut or placed. Mr. Pifer also refilled his marking chalk squeeze bottle when it became empty. The marking chalk created a lot of dust, which Mr. Pifer encountered on average fifty times per day.

Strait-Line marking chalk was the only brand of chalk that Dent stocked in its warehouse from 1960 to the 1980s. Dent purchased the chalk through two suppliers: L.

2

Fishman & Son, Inc. and Michael Halebian & Co. In the 1980s, Dent started using a cutting machine, which greatly reduced Mr. Pifer's chalk exposure. In 1989 or 1990, Mr. Pifer transitioned to working in the office, and his exposure to Strait-Line marking chalk ended.

Doctors diagnosed Mr. Pifer with malignant mesothelioma on October 27, 2016. He died from the disease two months later, on December 30, 2016. The primary cause of mesothelioma is exposure to asbestos. 1A Arthur L. Frank, *Sourcebook on Asbestos Diseases Medical Aspects* 65 (2004).

**A. Chalk Samples And Evidence.**

The investigation into Irwin's Strait-Line chalk began after Mr. Pifer's death. The Estate noticed a bottle of Strait-Line chalk in Mr. Pifer's garage among the tools he used when working for Dent. The Estate gave the chalk bottle and the tools to counsel, who sent it to a laboratory for analysis. The chalk bottle was the only item that had positive results for asbestos.

The parties do not dispute, as the Estate explains in its brief, that to test the proposition that Strait-Line Chalk—beyond the one bottle located in Mr. Pifer's garage— was contaminated with asbestos the Estate's counsel acquired vintage samples of Strait-Line chalk from around the country, primarily through eBay.

Dr. William Longo, the Estate's expert, analyzed all of the samples at Materials Analytical Services, LLC ("MAS"). Dr. Longo analyzed the samples using three well-recognized methods: polarized light microscopy, analytical transmission electron microscopy, and automated field emission scanning electron microscopy. Thirty-six samples were tested in total:

- Twenty samples were labeled as Irwin Auger Bit Co. Of these, three were not sealed when received for testing. One of the three, however, was the sample from Mr. Pifer's garage.

- One sample was labeled as American Tool Co. This sample was open when it was received for testing.

- One sample was labeled as Irwin Tools. This sample was open when it was received for testing.

- Fourteen samples were labeled as The Irwin Co., none of which was sealed when received for testing.

Of the thirty-six samples, the expert found the following:

- Nineteen samples (53%) tested positive for regulated amphibole asbestos. Of the nineteen that tested positive, three samples were opened when received for testing, one of which was the bottle found in Mr. Pifer's garage.

- The primary source of the regulated asbestos in the nineteen positive samples was from either dolomite/calcium carbonate or talc used in these marking chalk products.

- The analysis and results of the nineteen sealed Irwin containers removes the possibility that the samples were tampered with or contaminated prior to their arrival at MAS.

- Eighteen of twenty (90%) of the samples manufactured by The Irwin Auger Bit Company from 1960 to 1982 tested positive for asbestos.

- Fourteen of fourteen (100%) of the samples manufactured by The Irwin Company from 1982 to 1993 tested negative for regulated asbestos.

The samples tested positive for noncommercial amphibole asbestos, more specifically "[a]ll of the amphibole fibers and bundles found using either [method of analysis] were either regulated tremolite/actinolite or anthophyllite asbestos." "Asbestos fibers belong to one of two mineral groups: amphibole or serpentine." Frank, *supra*, at 4–5. Both anthophyllite and tremolite are amphiboles. *Id.* "Anthophyllite, a natural contaminant of talc and other forms of asbestos, no longer occurs in quantities sufficient

4

for commercial use." *Id.* Tremolite is also a natural "contaminant of talc" and "does not occur in any commercially useful quantities." *Id.* at 5–6.

The Estate asserts that asbestos is a naturally occurring contaminant of calcium carbonate. Calcium carbonate is a mineral mined from the earth, like talc, and was used to manufacture chalk products, including Irwin Strait-Line. The Estate claims that "[c]ontamination occurs [] when calcium carbonate cohabits the same geological mining location as asbestos." In his affidavit, Dr. Longo states, as an example, that "calcium carbonate/limestone as well as talc and asbestos are often located in the same geological areas in Georgia."

Irwin contends that the Irwin marking chalks alleged to have been used by Mr. Pifer were formulated to contain only calcium carbonate. Further, Irwin argues that the Estate has "not identified any published scientific literature or government guidance . . . that establishes or even postulates that calcium carbonate can be contaminated with asbestos fibers."

**B. Procedural History**

On July 13, 2018, the Estate filed a wrongful death asbestos product liability action against several defendants, including Irwin. The complaint specifically alleged "that Irwin proximately caused [Mr. Pifer's] mesothelioma and death through its manufacture and sale of asbestos-contaminated Strait-Line marking chalk." On July 1, 2019, the Estate filed its first amended complaint. Irwin moved *in limine* on September 5, 2019 to preclude all testimony and evidence regarding the testing of marking chalk by the Estate's expert, Dr. Longo. One day later, Irwin filed a motion for summary judgment.

5

At the motions hearing on October 15, 2019, the circuit court precluded all evidence relating to the eBay-procured samples of chalk but found that the garage sample was admissible. Two days later, on October 17, 2019, the circuit court issued an order granting Irwin's motion for summary judgment and an order formally granting the motion *in limine* as to the eBay samples "due to lack of established authenticity." The Estate filed this timely appeal. We supply additional facts as needed below.

## II. DISCUSSION

The Estate argues on appeal that the trial court applied the wrong legal standard and erred in requiring stringent proof of the chain of custody of the chalk samples acquired from eBay. The Estate contends that the burden to authenticate is slight—the judge should act as the evidentiary gatekeeper, it says, and leave the ultimate question of authenticity to the jury. Additionally, the Estate argues that the trial court erred in granting Irwin's motion for summary judgment in reliance on its evidentiary ruling.[1]

Irwin argues that the trial court properly exercised its discretion as evidentiary gatekeeper and applied the correct legal standard in finding that the samples could not be authenticated without a complete chain of custody. Irwin also argues that the Estate waived

---

[1] The Estate phrased the Questions Presented in its brief as follows:

> I. Did the trial court err when it created and applied a novel test for authentication of evidence instead of the test outlined by the Court of Appeals regarding authentication under Maryland Rule 5-901 which requires only a minimal showing and that the jury resolve competing inferences?

> II. Did the trial court err when, in reliance upon its erroneous ruling regarding authentication, it granted summary judgment in favor of the defendant for lack of evidence?

its right to appellate review of the trial court's grant of summary judgment. And Irwin contends, even if the trial court erred in granting the motion *in limine*, that error was harmless because the Estate cannot carry its burden to establish the elements of its product liability and negligence claims.[2]

### A. The Estate Met Its Threshold Burden To Prove The Samples Were Authentic.

On appeal, the Estate argues *first* that the circuit court conflated the authentication standard for the admissibility of evidence and the burden of proof for the Estate's product liability claim on the merits. *Second*, it argues that the court erred in ruling that the Estate must satisfy a chain of custody requirement to prove that the chalk reached the user in substantially the same condition as when it left the manufacturer, Irwin. At the center of both arguments is the notion that authenticity is a question for the jury and is not for the judge to determine at a motions hearing, and that an evidentiary threshold doesn't require a plaintiff to satisfy its burden of proof on the merits of the claim. Irwin responds that the

---

[2] Irwin phrased the Questions Presented in its brief as follows:

> 1. Whether the trial court properly exercised its discretion as the gatekeeper of evidence in ruling that Appellants did not properly authenticate the eBay samples.
>
> 2. Whether Appellants waived appellate review of the trial court's ruling pursuant to Maryland Rules 2-501(b), 2-501(c), and 5-703 that Longo's Affidavit did not create a material fact in dispute sufficient to defeat summary judgment.
>
> 3. Whether the trial court properly granted Irwin's Motion for Summary Judgment.
>
> 4. Whether, assuming *arguendo*, that the trial court's authenticity ruling was in error, it was harmless error.

trial court appropriately acted as an evidentiary gatekeeper and applied the correct legal standard when it required the Estate to establish a chain of custody for the chalk samples. Irwin characterizes the court's gatekeeper role as an essential safeguard against a jury jumping to conclusions and assuming authenticity when presented with tangible evidence. This back-and-forth reveals the critical tension between the factual disputes that juries get to resolve and the evidence they should be allowed to consider in resolving them.

"The admissibility of evidence, including rulings on its relevance, is left to the sound discretion of the trial court, and absent a showing of abuse of that discretion, its ruling will not be disturbed on appeal." *Farley v. Allstate Ins. Co.*, 355 Md. 34, 42 (1999) (*citing White v. State*, 324 Md. 626, 636–37 (1991)). "An abuse of discretion occurs 'where no reasonable person would take the view adopted by the [trial] court,' or when the court acts 'without reference to any guiding rules or principles.'" *Brass Metal Prods., Inc. v. E-J Enters., Inc.*, 189 Md. App. 310, 364 (2009) (*quoting North v. North*, 102 Md. App. 1, 13 (1994)).

### 1. Procedural posture of the issue

The Estate's products liability claim relies on several samples of Irwin chalk. One, a single squeeze bottle of chalk, was found in Mr. Pifer's garage. But that's the only sample that was in Mr. Pifer's possession—the Estate obtained the remaining samples, many of which were one-ounce exemplars, from sellers on eBay. The Estate's expert tested all of them, and the Estate seeks to use those results at trial to prove that Irwin's chalk was the source of the asbestos that caused Mr. Pifer's mesothelioma. Irwin's motion *in limine* sought to preclude all testimony and evidence about the testing of the samples on the

grounds that they weren't authentic or relevant. The Estate countered that there is no dispute about the authenticity of the containers—all are labeled with Irwin's trade markings and are in the Strait-Line form Irwin produced—and that the dispute relates only to their contents. The Estate asserts that the possibility of contamination is low because the samples were from a span of several years, from several different states, and many of the samples were sealed upon receipt. The authenticity question, then, boils down to whether, and to what degree of certainty, does the Estate have to prove at the threshold, as a condition of offering them as evidence, that the samples aren't contaminated.

At the motions hearing, the trial court found that the Estate needed to establish a chain of custody to authenticate the samples procured from eBay because they are susceptible to tampering or alteration. There was no specific evidence that the samples had been altered or tampered with—the court grounded its finding that the samples were susceptible to tampering merely by the passage of time: "the extraordinary passage of time almost militates th[e] court's inability to buy into the [expert's] affidavit and representation that [the authenticity is] just common sense." The court excluded the "eBay samples from admissibility or usability for any purpose that [was] identified in the motion in limine and the motion for summary judgment."

### 2. *The appropriate legal standard*

The crucial question, then, is the appropriate legal standard for determining the authenticity of the eBay exemplars. Under Maryland Rule 5-901, "[t]he requirement of authentication or identification as a condition precedent to the admissibility is satisfied by *evidence sufficient to support a finding that the matter in question is what its proponent*

9

*claims.*" (emphasis added); *see id.* (b)(4) ("Circumstantial evidence, such as appearance, contents, substance, internal patterns, location, or other distinctive characteristics, that the offered evidence is what it claims to be" is an illustration of authentication or identification conforming with the requirements of the Rule). The Estate claims the eBay exemplars are evidence of the Strait-Line chalk that Irwin produced from 1960 to 1982, the chalk that Mr. Pifer used, and that the chalk contained asbestos. To meet the standard, the proponent must show a reasonable probability that the evidence has not changed condition, "so as to be unreliable." *Jones v. State*, 172 Md. App. 444, 463 (2007) (*citing Wagner v. State*, 160 Md. App. 531, 552 (2005)).

There's not much dispute about the words that define the standard, but there is substantial divergence in the quantum of proof required to satisfy it. The Estate urges us to view the reasonable probability through the eyes of the reasonable (future) juror, *i.e.*, that the authentication "requirement is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." *Sublet v. State*, 442 Md. 632, 666 (2015) (*quoting United States v. Vayner*, 769 F.3d 125, 129–30 (2d Cir. 2014)); *see also Jackson v. State*, 460 Md. 107, 122 (2018). Irwin argues that the Estate needed to establish a complete and reliable chain of custody for the exemplars to be admissible. Irwin contends that a party must present evidence "negating the probability of changed conditions" and "a possibility of 'tampering.'" *Amos v. State*, 42 Md. App. 365, 370 (1979).

*3. The trial court's finding*

The trial court agreed with Irwin and required the Estate to prove the absence of

10

tampering as a condition of authenticity. In its oral opinion granting Irwin's motion *in limine*, the court began by noting that the evidence supports only the *possibility*—not the *probability*—that the samples' contents are what they are purported to be:

> THE COURT: And to address the mere findings of those one-ounce containers in any fashion analogous to Mr. Pifer's use in commercial setting would be sheer speculation. I mentioned that because I want to acknowledge that plaintiff properly relies on circumstantial evidence to -- consistent with what we see in cases like Rowhouses, Inc. v. Smith that set forth 466 Md. 611. It's a 2016 case. It is possible, it is conceivable, it's entirely appropriate to contemplate circumstantial evidence to get where the plaintiffs need to get. It's the only way the method by which the plaintiffs can get where they need to get. But the plaintiff's circumstantial evidence in these circumstances at best supports the mere possibility that the samples are what they appear to be, not the probability that's required under the applicable standard.

A quick tangent: *Rowhouses, Inc. v. Smith*, 446 Md. 611, 654–58 (2016), was not an authenticity case. The question there was whether the plaintiff, who was seeking to establish that a Baltimore dwelling contained lead paint long ago, had proven *on the merits* a reasonable probability that lead had been present at the relevant time. In that context, the Court of Appeals defined a reasonable probability as "less than 'more likely than not,' but more than a mere 'possibility,'" *id.* at 655, or "a fair likelihood that something is true." *Id.* at 657. The court wasn't applying that standard as a condition of admitting the evidence in the first place, but rather on the ultimate question of whether the plaintiff's circumstantial evidence had satisfied an element of its claim on the merits.

Back to this case. The circuit court found that the Estate had to prove to a reasonable probability that the samples acquired from eBay were in substantially the same condition

11

as when they left Irwin's control because of the decades that had elapsed from when the samples were manufactured to when they were tested. In reaching that conclusion, the court looked at the samples' data individually, comparing and contrasting the differences in the testing results:

> THE COURT: Whenever the plaintiff relies on circumstantial evidence to get where they need to go, probability rather than possibility is required. Given that the way in which the eBay samples were secured, tested, presented, opened and subject of Longo's opinion that they were factory sealed and unopened, not --couldn't be tampered with over the course of decades through an unknown chain of custody, I cannot find that the samples are in substantially the same condition as when they left the defendant's control.
>
> * * *
>
> That may be a distinction without making a difference, but when you look sample by sample, content by content, container by container, which I believe I'm duty-bound to do, instead of looking at these samples in the aggregate, the differences do mount up. And given the ultimate plaintiff's responsibility, even if plaintiff could establish that Irwin produced chalk that was contained in those eBay samples or containers, plaintiff cannot establish that the tested samples are identical or is the material that Pifer himself used.
>
> * * *
>
> The plaintiff is providing me with incomplete chains of custody. Plaintiff cannot account for the fact that at a minimum it's a 36-year gap between when the samples were manufactured and when they were purchased on eBay.
>
> I find that the plaintiffs have failed to make the requisite showing under 5-901. And I've gone one step further and find that I can't let the samples in.
>
> Based on Mr. Longo's expert testimony, applying, and relying on the guidance of Rule [5]-703.
>
> I go one step further to say that I haven't seen and I believe that plaintiffs have failed to meet their burden to establish the eBay samples themselves are in substantially the same condition as

12

they were at any point in time after they left the defendant's control sometime between 1960 or 1962 and 1982.

And certainly aren't the same or established any of the same material, the white chalk material used by Pifer when he's in the warehouse, let alone the colored material, the pigmented material, when he's acting as a mechanic.

Citing *Best v. State,* a criminal case, the trial court found that it would require nothing short of a "leap of faith" to find these samples authentic. 79 Md. App. 241. *Best*, however, relied on Sections 10-1001 to 10-1003 of the Courts and Judicial Proceedings Article of the Maryland Code ("CJ"), which relates to the admissibility of dangerous and controlled substances, not to circumstantial evidence in general. *Id.* at 250–51. *Best* analyzed the original 1974 version of CJ §§ 10-1001 to 1003, not the current versions of the law. *Id. Best* does, however, explain that the chain of custody in a criminal case must negate the possibility that the evidence has been tampered with:

> To be admissible . . . 'real evidence' must be in substantially the same condition that it was in at the time of the crime and must be properly identified. . . . Although there is a natural inference or presumption of continuance in the same condition, that inference varies in each case with the nature of the subject matter and the time element. . . .
>
> Whether real evidence is in the same condition as at the time of the crime so as to permit admissibility is not entirely a discretionary matter with the court . . . although the circumstances surrounding its safekeeping in that condition in the interim need only be proven as a reasonable probability . . . . The proof negating the probability of changed conditions between the crime and the trial, is spoken of as proving the chain of custody, and in most instances is established by accounting for custody of the evidence by responsible parties who can negate a possibility of 'tampering' and thus preclude a likelihood that the thing's condition has changed.

*Id.* at 250 (alterations in original) (*quoting Amos v. State*, 42 Md. App. 365, 370 (1979)).

Alternatively, the Estate relies on a line of cases analyzing the authenticity of social media posts. In *State v. Sample* and *Sublet v. State*, the Court of Appeals followed the principle that "'[a]uthentication of course merely renders [evidence] admissible, leaving the issue of [its] ultimate reliability to the jury.'" *Sublet v. State*, 442 Md. 632, 668 (2015) (*quoting United States v. Tropeano*, 252 F.3d 653, 661 (2d Cir. 2001)); *see also State v. Sample*, 468 Md. 560, 593 (2020). The Court's analysis, in both cases, focused solely on the authenticity of social media profiles and posts, not on physical evidence such as chalk exemplars, and especially not on physical evidence created long ago. But the resulting test for social media posts—"for a trial court to admit social media evidence, there must be sufficient evidence for a reasonable juror to find that the social media evidence is authentic by a preponderance of the evidence," *id.* at 597—flows from the same general overarching principle: when determining authenticity, the court looks at the relative likelihood that the evidence is what it purports to be, leaving the ultimate questions to the ultimate finder of fact.

*4. Determining the reliability of DNA evidence*

The Estate also points to cases evaluating the authenticity of circumstantial scientific and DNA evidence. And the reliability issues flowing from the admissibility of this type of scientific evidence relate more closely to the chalk exemplars at issue here since both involve evidence collected at a point in time and then tested in a lab.

In *Morten v. State*, we were confronted with determining the reliability of a DNA testing procedure as well as the reliability of the sample itself, due to its small size. 242

14

Md. App. 537, 578 (2019). The questions were whether the testing procedure was admissible, and whether "there [wa]s enough DNA to permit valid testing." *Id.* In deciding whether the sample itself was reliable, we held that "[r]eliability alpha must not be confused with reliability beta. Reliability is protean," *i.e.*, that before-trial reliability, determined as a matter of law, and ultimate reliability, determined by the jury as a matter of fact, are not the same. *Id.* at 584. The admissibility threshold is lower, but "[a]dmissibility of a test result as a matter of law [] does not in any way limit the opponent of the evidence from challenging its persuasive weight as a matter of fact." *Id.* at 585. "The issue of admissibility is only the opening round. The defendant still enjoys an inalienable right to expose the weaknesses of and to diminish the weight of the test results being offered against him." *Id.* And threshold admissibility, as a matter of law, does not establish ultimate persuasion, as a matter of fact. *Id.* (*citing Phillips v. State*, 451 Md. 180, 207 (2017)).

Even in cases requiring a chain of custody, there can be gaps so long as there is a reasonable probability that the evidence is what the proponent claims. In *Wagner*, the defendant challenged the trial court's admission of DNA evidence at trial. 160 Md. App. at 552–54. At issue was a glove and a single strand of hair found on the glove. *Id.* The neighbor of the victim found the glove, moved it to her back porch with the intent to throw it away, but found out about the murder and notified the police. *Id.* at 538. On appeal, Mr. Wagner argued that the testing technique used to test the hair sample was inadmissible under the *Frye-Reed* standard and that there were possible gaps in the chain of custody as well as possible lab contamination. *Id.* at 552–54. Mr. Wagner argued that the danger of laboratory contamination made the DNA sample unreliable and thus, inadmissible. *Id.* at

15

549. Based on expert testimony, the trial court and this Court found a "reasonable probability that there was no tampering" and that the expert opinions about the evidence would be of value to the jury. Mr. Wagner argued, as Irwin does with regard to the eBay samples, that the gap in the chain of custody made the DNA evidence inadmissible. *Id.* But even with gaps, we found that "there was a reasonable probability that the hair was in substantially the same condition." *Id.* at 553. We affirmed the trial court's finding because the circumstances surrounding an item's safekeeping "need only be proven as a reasonable probability." *Id.* at 552–53 (*quoting Best*, 79 Md. App. at 250).

Likewise, *Jones v. State* involved a challenge to the chain of custody of DNA evidence. 172 Md. App. 444, 462 (2007). "At the close of the State's case, the defense moved for judgment of acquittal on the ground that the DNA evidence was the only evidence linking the appellant to the crimes and that that evidence was unreliable, as a matter of law, because the State did not introduce evidence sufficient to establish chain of custody. The court denied the motion." *Id.* At trial, the State presented a chain of custody from the hospital to the various labs or units where the sample was either tested or stored. The defendant pointed out several faults: (1) the evidence had not been collected in a timely manner; (2) the evidence was not logged properly when it was picked up from the hospital; (3) it was unknown if the evidence had been refrigerated properly; (4) a signature was missing from the request for analysis; and (5) no semen was seen on the original swab, but semen was found when the evidence was analyzed. *Id.* at 462. We affirmed the trial court's decision to deny the motion for judgment of acquittal because the "evidence adduced at trial was sufficient to show by a standard of reasonable probability" that the DNA sample

16

had not been tampered with. *Id.* at 463. There was a chain of custody document and testimony for the sample, and the gaps in the documentation and testimony were not sufficient to "compel a ruling, as a matter of law, that a proper chain of custody . . . had not been shown." *Id.* "The State's chain of custody evidence met the threshold showing of a reasonable probability" that the evidence had not changed condition making it a reliable piece of evidence. *Id.*

There is no doubt that "[t]he law requires a party to establish a 'chain of custody' when offering certain items of evidence, in order to assure that the particular item is in substantially the same condition as it was when it was seized." *Wagner*, 160 Md. App. at 552 (*citing Lester v. State*, 82 Md. App. 391, 394 (1990)). A chain of custody is necessary for evidence that is susceptible to tampering. *See id.* at 552. For a chain of custody to be established, "it must create a reasonable probability of sameness." *Amos*, 42 Md. App. at 381. Essentially, the chain of custody needs to "preclude any reasonable probability [of] tampering." *Id.* But the circumstances surrounding the safekeeping of the evidence in the untampered "condition in the interim need only be proven as a reasonable probability . . . and in most instances is established . . . by responsible parties who can negate a possibility of 'tampering' . . . and thus preclude a likelihood that the thing's condition was changed." *Wagner*, 160 Md. App. at 552 (*quoting Best*, 79 Md. App. at 250). The purpose of proving a chain of custody is to prove that the evidence hasn't been altered. But in the absence of evidence that there's any motive to alter it, gaps in chain of custody can go to weight rather than admissibility. *See Jones*, 172 Md. App. at 462–63.

It's possible in the abstract that these chalk exemplars could be susceptible to

17

tampering. But there's no evidence of tampering beyond hypothesis, and the stakes are very different here than in a criminal case involving controlled dangerous substances or a murder weapon. *Amos*, relied on by Irwin and the trial court, recognized that "[w]hen drugs are submitted to police laboratories for analysis, and held in drug lockers with 'say two hundred (other specimens) to be tested,' there is far greater risk of misidentification than there is of changed conditions." *Amos*, 42 Md. App. at 370–71. To be sure, these samples have been sitting for a lot longer than evidence sits awaiting a criminal trial (or even most post-conviction retrials). But there is no evidence, or even informed speculation, that the Estate, the eBay sellers, or anyone had a motive to alter or tamper with these exemplars.

*5. Application of reliability standards to the chalk exemplars*

We disagree, then, that the Estate was required to establish a seamless chain of custody in order to prove a reasonable probability that the exemplars are what the Estate claims. To the contrary, the Estate demonstrated a reasonable probability of sameness. Indeed, there is no dispute that (1) the exemplar containers are Irwin's, (2) noncommercial amphibole asbestos is regulated and not easily found, (3) the eBay samples came from nine different sellers in seven different states who, to tamper as Irwin claims, would have had to lace the Irwin chalk exemplars with asbestos intentionally, (4) a majority of the exemplars tested positive for asbestos, (5) each exemplar contained chalk matching the color designated on the label, and (6) an overwhelming majority of the samples arrived sealed and with no evidence of tampering. That's enough to get these samples over the threshold, and that leaves Irwin free to argue its views on the contents to a jury, which in turn is free to decide if Irwin's chalk exposed Mr. Pifer to the asbestos that caused his

18

mesothelioma.

Again, Irwin does not dispute that the containers containing the exemplar chalk are

Irwin's containers:

> [COUNSEL FOR IRWIN]: Here, the containers may very well be Irwin containers. I'm certainly not going to take the position that the containers don't appear to be ours. That's not anything we are arguing here.

The Estate showed that the one-ounce exemplar containers, unlike the squeeze

bottle found in Mr. Pifer's garage, were not intended to be refilled:

> [COUNSEL FOR THE ESTATE]: There is only one refill bottle at issue in the '60 to '82 time frame. And that's the one that was found in Christine Pifer's garage with Mr. Pifer's tools. Every other -- there are four refill bottles total out of the 36 samples, but the only one manufactured in the 1960 to 1982 window is the Irwin Auger Bit sample that was procured from Christine Pifer's garage.
>
> * * *
>
> [COUNSEL FOR THE ESTATE]: The little one-ounce bottles aren't designed to be refilled. There's no evidence of that. The half-pound cans with the small spout aren't designed to be refilled. There's no mechanism to do so, other than trying to pour something back into the spout from whence it came.
>
> Again, the only bottle that is designed to be refilled is - - and that was manufactured between 1960 and 1982 - - is the one that came from Mr. Pifer's garage.

The Estate demonstrated that each exemplar contained chalk matching the color

designated on the label, that the eBay samples came from nine different sellers in seven

different states, and that an overwhelming majority of the samples arrived sealed and with

no evidence of tampering.[3] The Estate argued, and Irwin didn't counter, that it is unlikely that the previous owners of the exemplars would have intentionally found and laced the samples with noncommerical amphibole asbestos:

> [COUNSEL FOR THE ESTATE]: The Court also states that as a matter of reasonable probability possibilities of adulteration have been eliminated. And these are the same sorts of inquiries that this Court is faced with in this circumstance.
>
> As a matter of reasonable probability, what is the likelihood that these sample were all filled by eBay sellers from eight separate cities with noncommercial amphibole asbestos marking chalk and resealed, or even the ones that were weren't sealed.
>
> I submit that one could spend an awful lot of one's life looking around to find somewhere a marking chalk contaminated with noncommercial amphibole asbestos and refill it, let alone the happenstance of 90 percent of the samples from that 1960 to 1982 window coming back positive for noncommercial amphibole asbestos. I submit that is highly unlikely.

Moreover, a majority of the samples that tested positive for regulated amphibole asbestos that are being relied upon by the Estate were sealed when received by the lab. Twenty samples were labeled with "Irwin Auger Bit Company" and, according to the lab's analysis, "[o]f these 20 samples, 18 were positive (90%) for regulated amphibole asbestos. Additionally, of the 18 Irwin Auger Bit Co. containers that was [sic] positive for regulated amphibole asbestos, 16 these [sic] Irwin containers were sealed when received . . . ." In the conclusions of his report, the Estate's expert states that:

> The analysis of the 19 sealed Irwin containers removes the possibility that before MAS has received these sealed Irwin containers, they were somehow tampered with or replaced with

---

[3] And there is no dispute about the chain of custody for the exemplars once they were in the Estate's possession.

20

> some unknown chalk product from another manufacturer. The chalk material in these Irwin sealed containers was placed there when first manufactured by Irwin, until they were opened at MAS in 2019.

The percentage of the exemplars that tested positive also would support a finding that the presence of asbestos in the chalk exemplars was more than a mere coincidence. Nineteen of the thirty-six (or 53%) samples tested were positive for regulated amphibole asbestos. Eighteen of twenty (or 90%) of samples manufactured by The Irwin Auger Bit Company from 1960 to 1982 tested positive for asbestos.

Irwin argued in its motion *in limine* and on appeal that in addition to being susceptible to tampering, chalk containers are designed to be refilled and could have their contents mingled. But the Estate countered this argument by using exemplars that are not intended to be refilled but to serve as sales examples, leaving that question disputed at most.

This record doesn't yield an airtight conclusion about the contents of these samples, but, viewed as a whole, establishes as a matter of law a reasonable probability or a fair likelihood that the chalk exemplars were manufactured by Irwin and are representative of the chalk they contained at the time they were manufactured. The ultimate question of what they are, and whether they prove what the Estate claims, is for a trier of fact to answer. A gap in the chain of custody does not render evidence categorically inadmissible but is part of the factual picture the jury should consider in determining whether the evidence is reliable and whether the Estate has met its burdens of proof on the merits. And Irwin will be entitled to a full opportunity to cross-examine the Estate's expert and to provide

whatever counter-evidence it can—threshold admissibility is exactly that, and "does not establish ultimate persuasion, as a matter of fact." *Morton*, 242 Md. App. at 585. By requiring the Estate to prove the negative, *i.e*., an unbroken chain of custody from the factory and the absence of tampering, the trial court required more than a reasonable probability that the samples are exemplars of the chalk Mr. Pifer used, and we reverse the decision to grant Irwin's motion *in limine*.

**B.      The Summary Judgment Ruling Cannot Survive On This Record.**

Where, then, does this leave the case? The Estate, naturally, asks us to reverse the summary judgment order, and our decision to reverse the decision granting the motion *in limine* normally would compel that result. Irwin argues, however, that if we were to find that the court erred in excluding the eBay samples, the error was harmless, and it nevertheless is entitled to summary judgment as a matter of law for four separate reasons: (1) Irwin owed no duty to Mr. Pifer; (2) the Estate cannot make a prima facie case of a manufacturing defect; (3) the Estate's evidence only supports a possibility that the chalk was contaminated and that Mr. Pifer was exposed to asbestos; and (4) the Estate cannot prove that Mr. Pifer "frequently, regularly, and proximately" was exposed to asbestos.

When a case is decided on summary judgment, there have not been factual findings by a judge or jury. *Mohammad v. Toyota Motor Sales, Inc.*, 179 Md. App. 693, 702 (2008). The judge is making a ruling as a matter of law. *Id.* "Thus, '[t]he standard of review of a trial court's grant of a motion for summary judgment on the law is de novo, that is, whether the trial court's legal conclusions were legally correct.'" *D'Aoust v. Diamond*, 424 Md. 549, 574 (2012) (alteration in original) (*quoting Messing v. Bank of Am., N.A..*, 373 Md.

672, 684 (2003)). "On review of an order granting summary judgment, our analysis 'begins with the determination [of] whether a genuine dispute of material fact exists; only in the absence of such a dispute will we review questions of law.'" *Id.* (alteration in original) (*quoting Appiah v. Hall*, 416 Md. 533, 546 (2010)). Therefore, our review is plenary and "[o]ur threshold task is to determine whether there is any genuine issue of material fact." *Mohammad*, 179 Md. App. at 703 (*citing Dashiell v. Meeks*, 396 Md. 149, 163 (2006)).

Essentially, a party must present evidence to show a genuine dispute of material fact and the ability of the jury to reasonably find for the party. *Id.* (*quoting Crickenberger v. Hyundai Motor Am.*, 404 Md. 37, 45 (2008)). We review the evidence to "determine whether 'there is a dispute of material fact sufficient to provide an issue to be tried.'" *Roy Dackman*, 445 Md. 23, 39 (2015) (*quoting Charles Cty. Comm'rs v. Johnson*, 393 Md. 248, 263 (2006)). "When things are in such a posture, courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (*quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam)); *see Mohammad*, 179 Md. App. at 702. "We evaluate the facts and pleadings employing the same standard as does the circuit court, and will not defer to that court's conclusions of law." *Mohammad*, 179 Md. App. at 703.

In its motion for summary judgment, Irwin argued that the "record before the [trial court] demonstrates that there are no disputes of material fact on the threshold issue of whether [Mr. Pifer] ever personally used a container of Irwin's Strait-Line marking chalk that was contaminated with asbestos." Specifically, Irwin contended that if the trial court

were to grant its motion *in limine* as to authenticity, Irwin would be entitled to summary

judgment *in toto*. Additionally, Irwin argued the Estate could not, as a matter of law, prevail

on any count in its complaint because the Estate could not prove that Mr. Pifer was exposed

to an asbestos-containing product by Irwin or that any Irwin product was contaminated

with asbestos in a quantity able to harm Mr. Pifer.

In response, the Estate argued, in addition to the arguments on the motion *in limine*,

that there were genuine disputes of material fact about the source and extent of Mr. Pifer's

exposure to Irwin's chalk and, therefore, to asbestos.[4] The Estate cited the facts that

Mr. Pifer began working for Dent in the 1960s, that he used Strait-Line chalk frequently,

and that the exemplars from the relevant time period tested positive for noncommercial

amphibole asbestos.

At the motions hearing, the trial court ruled that the eBay samples were inadmissible

as to the disposition of the summary judgment motion because of its decision regarding the

motion *in limine*:

> THE COURT: So for all of those reasons and based on
> everything that I've heard today, as well as the documents that
> I have identified as having been reviewed and the arguments
> that I've read in the papers, I shall exclude the purchased eBay
> samples from trial.
>
> I shall also disregard those eBay samples pursuant to Rule 2-
> 501 because they're not admissible evidence, and they're not
> usable to approach summary judgment.

At the same hearing, though, the trial court found the garage sample admissible and

---

[4] In its opposition to Irwin's motion for summary judgment, the Estate did concede that
Irwin was entitled to summary judgment on its breach of warranty claim.

that sample alone generated disputed issues of material fact:

> THE COURT: I am going to take a very narrow view of what actually was raised and requires attention on the face of the summary judgment motion and motion papers. I believe that the focus and attention in the summary judgment motion on whether and when the product was contaminated and to which Pifer was exposed presents even on the strength of a single sample, garage sample, a dispute of material fact. . . .
>
> For summary judgment purposes, looking at the literal language of 2-501 and the case I'm going to find disputed material fact.
>
> * * *
>
> That's as far as I'm going today. I'm denying the motion for summary judgment in pertinent part based on the likely admissibility of the garage sample.

Based solely on the garage sample, the court found a disputed issue of material fact as to whether Mr. Pifer had used a contaminated product, and that other issues, such as medical causation, hadn't been addressed in the motion. The court expressly took under advisement the question of whether Irwin had owed a duty to Mr. Pifer. "I'll make it clear," the court said, "for current purposes that as to the consequences of the likely admissibility of the garage sample, that the motion for summary judgment is denied." For reasons we can't discern, though, the Estate, in its reply brief and oral argument in this Court "conceded [on October 16, 2019,] that if the motion *in limine* was granted [the Estate] would have no authentic evidence or admissible evidence to challenge Irwin's request for summary judgment. Why it did this, we don't know. And a day later, on October 17, 2019, the trial court issued two two-page orders—one denying the motion *in limine* and the second stating, without explanation, that the motion for summary judgment was granted.

We are disinclined on this record either to infer a favorable ruling for Irwin on these

specific theories from the circuit court's one-line ruling or to rule on these alternative theories in the first instance. It's possible that during the intervening day or so, the court reached conclusions on summary judgment theories it had denied initially or taken under advisement. But the straightforward reading of this record says that the Estate conceded that it needed the eBay samples to defeat summary judgment and the court took the Estate at its word. We express no views on whether Irwin can or should prevail on its other summary judgment arguments—those are for the trial court to consider, if it chooses, on remand, and in light of our ruling regarding the admissibility of the eBay samples.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY IS REVERSED AS TO THE MOTION IN LIMINE, VACATED AS TO THE MOTION FOR SUMMARY JUDGMENT AND CASE REMANDED FOR FURTHER PROCEEDINGS. APPELLEE TO PAY COSTS.**

The correction notice(s) for this opinion(s) can be found here:

https://mdcourts.gov/sites/default/files/import/appellate/correctionnotices/cosa/1849s19cn.pdf